Ktysey, O. J.
This case comes before the court on a motion for a non-suit on a case stated, and the question reserved at the trial.
¡ His honor here detailed the circumstances, which have been before stated.]
If I have formed a correct idea of the questions that are really involved in this statement of the facts, a much wider field has been taken in the argument than was required. But as the points which have been examined by the counsel are, in themselves, highly important, and entitled to our serious consideration, the court have deemed it advisable to express upon them the opinion they have formed, that the questions may be considered as settled by a solemn adjudication, after a most elaborate and ingenious argument.
It has been contended, by the counsel for the plaintiff, that the independency of the United States was inchoate and incomplete, until recognized by the treaty of peace, and acknowledged by Great Britain. This question has been argued with much ingenuity, and the opinion which the court has formed recognizes, to a certain extent, the weight of the arguments which have been urged on each side.
To establish the doctrine for which the plaintiff contends, reference has been made to some of the writers upon national law. .Puffend. 1. 7, e. 7, sec. 5: Grot. 1. 2, c. 9, sec. 10; Vattel b. 1 c. 17, p. 878. The opinions of public jurists can have but a remote bearing upon a question which is to be governed wholly by our own municipal laws; and however great may bo the respect duo to them, within the sphere to which they intended to confine themselves, they cannot be regarded as authoritative in our courts. Puffendorf seems to think, that when a people are driven by oppression to have recourse to arms to protect their rights, and to remove themselves from under the tyranny of a master who has violated their immuties, they do not require any recognition of their claims to give them a title to liberty. This is also the idea of Vattel, whose authority is, perhaps, entitled to even more weight: *400 This doctrine is only applicable when the attempt is bottomed on justice, and the resistance to power is sanctioned by abstract right.
*General expressions of this description, cannot answer any valuable purpose, or be referred to as conferring a sanction upon any doctrine. The question still remains untouched, whether the attempt is, or is not a legal one ? Those who make it will always consider it as authorized ; those whose authority is opposed will always pronounce it as rebellious; and with regard to third parties, who may be supposed impartial, the right will ever depend upon the result of the contest. Success will legalize any rebellion or any tyranny.
Still, however, without referring to difficulties of this kind the language that has been cited does not touch the question which this case involves. Nothing is said with regard to the fate of former rights existing in the individual members of the communities thus separated; it is not said how the separation, whenever complete, is to affect private rights.
That the state of New Jersey was wholly absolved from the authority of the British government antecedent to, and independent of any recognition of it by Great Britain, so far as regards the power and the right of self-government, cannot admit of a question in a court of this state, where all authority, of every description, is derived from, and continues to be exercised under a constitution, established by the people, not only prior to the treaty of peace, but even antecedent to the congressional declaration of independence.
The principle upon which we professed to act, and really did act, was, that whenever a prince neglects or abandons his duty as the protector and guardian of his subjects— whenever he endeavors, by the terror of his power, the weight of his authority, or the force of arms, to compel them to a surrender of their essential privileges, instead of protecting them in the exercise of their immunities, a people have a right, by their own strength, to protect these rights, *401 and to adopt every measure which may be necessary to effect this purpose. This is the fundamental principle of American law; it lays at the foundation of our government; it is the corner-stone of our political existence and sovereignty; and on this ground were our constitution and the congressional declaration of independence founded.
Prior to the organization of our present system of government, all authority emanated from, and all power was exercised under the King of England. Congress disclaimed this authority by their *deelaration of independence, on July 4, 1776, and perceiving the absurdity of continuing a mode of government, after having disclaimed the authority from which it was derived, they recommended to the several states the adoption of another, deriving its authority from the people. This had been done in this state, previous to this recommendation. It appears, however, perfectly clear to me, that neither the convention of New Jersey nor the congress had any other object in view than the establishment of an internal and independent government, which might claim and exercise the sovereignty of the people, now called upon to defend those rights of which their king and lawful protector had endeavored to- despoil them. The rights of individuals, or the manner in which they might be affected by this abandonment of the former government, or the establishment of a new one, did not come under their consideration or enter into their views. The common law of England extended to this country, and was operative here; if that law had made provision for a case of this kind, and had prescribed a rule by which the rights of individuals were to be ascertained and governed, it was wholly unnecessary that any constitutional provision should be made.
The question then occurs, does the common law furnish us with any such rule ? If it does, and if the lessor of the plaintiff has a right under it, we cannot presume that our government, in 1776, intended to deprive British subjects of rights and privileges for their adherence to a king, who, *402 however he may have acted towards us, had given them no cause of offence. Unless there is some plain and unequivocal act to shew that such was the intention of the congress or state convention, it would be greatly transcending our legitimate functions to declare, that the effect of their acts was to abrogate a previously existing law. The constitution of this state acknowledges and confirms the authority of the common law, and whether this was or was not necessary to give it validity under this new government,* it, at least, shews that no intention to abolish it was entertained.
Every writer on the common law states two circumr stances, which must concur, in order to make a man an alien in England: — 1. He must be born out of the alle.giance of the crown. *2. He must be born of parents who are not entitled to the privileges of natural born-subjects. 1 Bac. Abr. 125, &c. This is declared to be the law in the statute 25 Ed. 3, st. 2. Neither of these descriptions apply to the lessor of the plaintiff. At the time of his birth he was as capable of taking lands in New Jersey, either by descent or purchase, as any one born within our own limits. If he was at one time capable of taking this estate, the next question is, have any circumstances since occurred depriving him of this capacity ?
Calvin’s case, which received the solemn decision of all the judges, is the leading case upon this subject. One of the resolutions there was (7 Co. 54), that “ if the kingdom should, by descent, be divided and governed by different kings, yet all those that were born under one natural obedience, while the realms were united under one sovereign, should remain natural born subjects, and no aliens.” It has been attempted to shew that this law was, inapplicable to the present case, because here the division was effected by arms, there by descent. To this it might be sufficient to *403 reply, that oar separation was, in fact, effected by force, but the right to separate was given us by law; the compact and the ties of connection were founded on right, and recognized by law; the violation of our rights, by the king, dissolved the compact, according to the principle which has been previously laid down. The contest between our armies and those of England was the means by which we secured a right that belonged to us, previous to our forcible maintenance of it; but the separation was legally made by the non-fulfillment of the duties which the king was bound to perform.
This answer may be deemed too refined and metaphysical, but another is furnished, perfectly conclusive, by Lord Coke-He assigns reasons for the law which has been cited, which clearly shew the distinction to be wholly in imagination; “for that naturalization due and vested by birthright cannot, by any separation of the crowns afterwards, be taken away; nor he that was, by judgment of law, a natural subject at the time of his birth, become an alien by such a matter ex post facto.” These reasons shew that the rule is not to be narrowed down, in its application, to cases where the separation has occurred by a descent of the crown, but that it applies to every imaginable case *of separation, from whatever causes it may have originated, or in whatever manner it may have been accomplished.
Nor did this opinion originate, as appears to be supposed, in any slavish subserviency to the monarch of the day. The doctrine had been laid down at a much earlier period by Braeton, and had become firmly incorporated into the law of the realm. It has been sanctioned by other cases, and it is founded in reason and good sense; and so far as it applies to the circumstances of the case under consideration, it cannot be contradicted without setting at defiance well established principles of law, and violating the plainest dictates of reason and of justice. With the exception of a single doctrine, originating as much in religious intolerance *404 and bigoted ignorance as in political sycophancy, and which proscribed infidels as perpetual enemies, outlawed from the rights and obligations of humanity, Calvin’s case has been considered as establishing legal principles, which have been uniformly recognized and approved of whenever occasion offered.*
So far as respects the question, now under discussion, it has received the assent of the judges, in the case of Apthorp v. Backus, which has been cited from Kirby, who say, that “ it would be against right, that a division of a state or kingdom should work a forfeiture of property previously acquired under its laws.” This sentiment needs but to be expressed to receive the acquiescence of all. The obvious inference from this doctrine is, that if a British subject^ born antecedent to the declaration of independence, while America and England were under the authority of the same government, and owed allegiance to one monarch, was considered as a natural born subject of that crown, and entitled, in every part of his dominions, to the rights and immunities which belong to that character, nothing has occurred subsequent to that period, which can deprive him of these privileges. Is there any statute law or adjudged case which shews him to have forfeited, or in any manner lost them? Lord Coke, and all the judges in Calvin's case say, that he cannot be deprived of them by any matter ex post facto.
If.any stronger authority is required to establish this doctrine, it is furnished by the act of the legislature of New Jersey, of the *29th December, 1781. This statute, passed more than five years subsequent to the declaration of independence, recognizes the fact, that lands were at that time legally owned by British subjects, which had never been .confiscated, or transferred to the state.
A question may here be raised, which has been ingeniously argued by the counsel, viz. from what period are *405 British subjects to be considered as aliens in these states ? It is not, perhaps, necessary to give any decisive answer to this question at present. Woodeson has been cited in the argument, but his language is indefinite, and not perfectly free from ambiguity ; he says, from the cession or treaty in 1783, “ the revolted Americans become aliens, in respect to their future concerns with England.” If by the expression, “ future concerns,” he means the capacity to make future acquisitions, and by “ the - revolted Americans,” those who were born previous to the commencement of the revolutionary struggle, his opinion is not law ; it is unwarranted by any precedent, and is directly contradictory to the opinions of lawyers of far more weight of character and authority than can possibly be attached to that gentleman. At the same timo, I am unable, satisfactorily to my own mind, to fix upon any period at which the separation can be said to bo completed, except that of the date of the treaty of peace. It was at that time, and by that measure, that the struggle for our liberties was terminated; that we became, to all essential purposes, distinct nations. Before that event the question was in suspense, the right was claimed and denied; the enemy had possession of some districts of our country, and of some of our principal cities, from which we were utterly unable to expel them. The event rested upon our success, and until that success became certain, until the contest was forever terminated by the treaty, our independency was questionable; there was no tribunal to determine the question but God, and the appeal had been made to him by arms.
The acceptance, by our government, of the cession and acknowledgment of the British crown in the provisional treaty, much more the making that acknowledgment a preliminary, and the refusal to treat until that was settled, corroborate the doctrines that have been stated, and shew how important a circumstance this was in the eye of both governments, and how essential *to make the sepa *406 ration complete. The word independency is a term of vague and indefinite signification. We created a government deriving its authority wholly from the people ; we overturned that which emanated from the king; we raised armies, and contended with the troops sent by him to conquer us ; so far we were, in fact, beyond his control, and independent of his authority. For all the essential acts of government, this independency was complete from 1776,* or else we were rebels; there can be no other alternative, and there can be- no difficulty in determining between the two to which we are confined. There is, however, no motive of policy, no argument furnished by reason, to induce us to determine that this complete separation or independency, which the treaty consummated, ought to refer back to 1776, in order to forfeit rights which had been acquired under the faith of the law. Such a construction would be equally unjust and unreasonable.
In some cases, however, the act of a government is considered the act of every individual in the nation, who are supposed either actually or virtually to recognize as then-own, every measure adopted by the rulers to whom then-constitution of government has delegated all political power.
It would, we think, be extending this doctrine to an unprecedented and unreasonable length, to consider it as creating an offence in every individual of the nation, so as to incur the forfeiture of rights which were previously vested in him by law. Still more unreasonable,- and still more unjust would it be, to consider the present lessor, an Irishman, as by any fiction or in any manner concurring in, and answerable for the acts of the British nation. Ireland is considered as a conquered country. 1 Bl. Com. 100. The British parliament claimed an equal right to make laws for them and for ús. We disclaimed the right, took up arms to defend our liberties, and finally succeeded in throwing off *407 altogether the yoke of British supremacy.* America and Ireland were equally under English dominion, and with the same color and show of.reason, might it have been contended, *that every American has concurred in the acts of parliament imposing unlawful taxes upon us, as that the inhabitants of Ireland assented to the measures of the British crown, or should be answerable for them. The British king and parliament acted unjustly, in violating our rights, but it would be infinitely more indefensible for us to deprive the inhabitants of Ireland of their rights in consequence of these measures, by persons over whom they had no actual or virtual control.
Another point has been argued, that whether the disability of the plaintiff to take the benefit of this devise was created by the treaty of peace, or by the declaration of independence, is immaterial, provided the rights conveyed by that devise did not vest in him previous to the treaty of peace. It has therefore been urged, on behalf of the defendant, that, bv the words of the will, no estate could vest in the lessor previously to his arrival in this country, and proving himself to be the person entitled to the benefit of the devise. This has been argued at the bar with much ingenuity, and the point lias been labored as if it wore in reality the important question in the case.
1. It appears clearly to have been the design of the testator, that in case his son returned, lie should receive the whole of his real and personal estate, with the exception of ¿B700, which he bequeathed, at all events, as a legacy to his granddaughter.
2. It is equally evident, that the testator looked forward to no event or combination of circumstances, which should entitle the granddaughter to the estate in controversy. If the son returned, she was to have ¿0700; if he did not, some other property in addition.
*408 This may therefore be considered as the general intent of the testator, and the will as merely the language or mode in which this intent was to be expressed; and all courts are bound to keep this general design in view, to construe the language of the will in reference to it, and to effectuate it in preference to any particular intent with which it may happen to be inconsistent.
It has been argued, that the coming over to America, and making himself appear the eldest son of Matthew, were conditions precedent, to be performed by the lessor before any estate or interest whatever in the premises could vest in him. We entertain an opinion directly opposite to this. Consideration has satisfied us that the words are altogether idle and nugatory, and *of too insignificant an import to create a condition. In what manner and at what time, could a condition of this kind be performed ? The son was absent, the executor who had the care of the estate was satisfied, and surrendered the possession; if, therefore, this was a precedent condition, it appears to me to have been fully complied with.
My own opinion is, that if this is to be considered, in any respects, as-a condition, it must operate rather as a condition subsequent than precedent; the estate vests in the lessor of the plaintiff immediately, by the demise of the testator, and the right continues until, by the return of the son, it becomes divested. This appears manifestly to have been the intent of the testator; and if the words employed can have any legal operation, this intent must govern in the construction of the will.
This is, however, a mere matter of speculation. In the eye of the law, an intention of this kind is altogether nugatory. So far as respects the coming over to this country, there is nothing in the will which points to such an event; with regard to his proving himself the person to whom the devise is made, the language is'* insignificant and useless. No one can ever take the benefit of a will without proving *409 that he is the person entitled to it; the law requires such proof invariably, and as verba quae taeite insuni nihil operantur, these being clearly implied in every devise, are not to control and defeat the intention of the devisor.
In the case of Pigg v. Caldwell and Edwards, Finch’s Rep. 278; 8 Vin. Abr. 332, one seized of lands, part of which were copyhold and part freehold, the former of which were under mortgage, devised all her lands, together with all her personal estate, to one Edwards, for seven years, on condition, within that time to pay her debts. She then gave the inheritance of the freehold lands to the complainant, he proving himself to be the sou of her son Thomas Pigg; after his decease, without issue, she devised the fee to Edwards. Edwards entered, and proved the will, but never paid the debts. The grandson exhibited his bill, praying for a discovery of the debts and of the real and personal estate of the grandmother; and lastly, that the debts in general might be paid, and the mortgage in particular, alleging, that otherwise he was likely to lose the estate; that, as an infant, he required funds for his maintenance. The chancellor decreed accordingly, without even an averment in the bill that the complainant *was the son of Thomas Pigg, or that he had ever proved himself to be so. The words requiring this proof are repeated three or four times in the will, and indeed the idea is never lost sight of when any interest is given to her supposed grandchild, of whose title to that character she appears to entertain some doubts.
This case satisfies me that words of this description cannot be construed as creating a condition by which the devise may possibly be defeated; they are nugatory and senseless.
The nephew, therefore, in this case, took a present vested interest under the wil'1. His estate could not be a remainder, because the whole was given to the son, if he returned, and nothing if he did not. If any interest vested in the son it must have been a fee, for no other estate is spoken of; and if a fee, no remainder could have been limited to take effect afterwards.
*410 But cases innumerable may be cited, to prove that the interest of the lessor was vested. When the testator devised to A. and his heirs, and -if he die before twenty-one, then to' B. and his heirs. A. died before twenty-one, but B. died before him; the question was, whether B’s. heirs should take? and the court held clearly, that though B. died in the life of A. yet his heirs might well take under the executory devise, for that such a dévise is not to be considered as a mere possibility, but as an interest vested, though not in possession, and consequently transmissible. Gurnel v. Wood, 2 Eq. Ca. Ab. 342, pl. 21; 8 Vin. Ab. 112, pl. 38.
The case of Selwin v. Selwin, decided by Lord Mansfield, and that of Moor et Rex v. Hawkins, by Lord Northington, in Chancery, cited in Roe v. Jones, (1 H. Bl. 30) shew that the law so far regards a mere possibility as to consider it as devisable and descendible. If so, there must be a vested interest, though whether it will ever be vested in possession is uncertain.
Under this view of the case, it is perfectly immaterial whether the treaty of peace did or did not render the lessor so far an alien as to be incapable of taking real estate in this country for his own benefit; the right had vested in him previously, and there is no question but that, being an existing and vested right, it is secured by that instrument.
Another difficulty still occurs, and presents a further barrier to the plaintiffs recovery in the present action. It has been *urged, that even if the right to the property is vested in him, still, being an alien at this time, he is incapacitated from suing in our courts in a real action. Even in England, and under the ordinary circumstances in which aliens are placed, the doctrine does not extend to this extreme. In the case of Fowler v. Down, (1 Bos. & Pull. 44, 48) Heath J., in delivering his opinion, considers the situation of the plaintiff as similar to that .of “ an alien, who may purchase lands, and maintain an action for them, unless the crown interposes.” The illustration is cited as *411 accurate, by Grose J., (7 Term Rep. 394) in the case of Webb v. Fox. Except so far as respects the king, the title of an alien is good against the whole world : but the king has no right to the land until office found. If this objection might be interposed by any one to prevent a recovery of legal rights, it would, in ordinary cases, be, to use the language of Lord Kenyon, (7 Term Rep. 393) “ an invitation to all the world to scramble for them.” Situated as the plaintiff in this case is, the provisions of the treaty, guaranteeing his rights, would be a mere mockery; for nothing can be imagined more preposterous than to secure rights, and yet say, that the owner shall not recover them them when withheld : to acknowledge their validity, but refuse to give them efficacy.
On the whole case, then, we think that the devise to the son of Matthew carried a vested interest; that the lessor was not subject to the disabilities of alienage at the time of the death of testator; that his rights were secured to him by the conventions between the two governments, and that he is not disabled to prosecute these rights on the ground of being an alien. The opinion of the court, therefore, is, that the motion far a non-suit be overruled, and judgment entered on the verdict, for the plaintiff.
Judgment for the plaintiff.*

In the case of Livingston v. Jefferson (4 Hall’s Amer. Law Jour., 78, 86), Marshall, C. J. expressed an opinion, that the common law would have been in force independent of any constitutional or legislative adoption.

 See 4 Oi'anch. 210, and the authorities there cited.

The treaty of peace contains a recognition of our independence, not a grant of it. 4 Cranch 212. 3 Dall. 255. 1 Munf. 617.

The statute 23 Geo. 3, c. 28, expressly declared, that, in all cases whatever, the people of Ireland should be bound only by laws enacted by his majesty and the parliament of that kingdom; since that period, however, the two countries have been incorporated by the union.

 See the opinion of Roane J. in Reed v. Reed, 1 Munf. 611, Appendix, and the case of Hunter v. Fairfax's devisee, 1 Munf. 218. Also 7 Crunch 603, where it is decided, that an alien may take lands, by purchase, in Virginia, and hold the same until office found. See, also, same point, 3 Wheat. Rep. 14, note. Ib. 539. Ib. 460.